IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE BANCORP BANK,<br><br>               Plaintiff,<br><br>v.<br><br>LAWYERS TITLE INSURANCE<br>CORPORATION, et al.,<br><br>               Defendants. | CIVIL ACTION<br>NO. 13-6103 |

## OPINION

**Slomsky, J.**                                                                                                                                                                                       **July 8, 2014**

### I.    INTRODUCTION

On September 19, 2013, The Bancorp Bank ("Bancorp" or "Plaintiff") filed the present action against Lawyers Title Insurance Corporation and Fidelity National Title Insurance Company ("Defendants") in the Court of Common Pleas of Philadelphia. (Doc. No. 1-5.) Defendants removed the case to this Court based upon diversity of citizenship jurisdiction, 28 U.S.C. § 1332(a). (Doc. No. 1.) On April 18, 2014, Plaintiff filed an Amended Complaint, alleging breach of contract (Count I); bad faith (Count II); and negligence (Count III). (Doc. No. 19.) On May 9, 2014, Defendants filed a partial Motion to Dismiss, which is now before the Court for disposition.[1] (Doc. No. 21.)

### II.    BACKGROUND

The following facts are taken from the Amended Complaint and must be accepted as true for purposes of the Motion to Dismiss. In or about February 2006, 6205-6207 Cortez Road

---

[1] In rendering this Opinion, the Court has considered the following: the Amended Complaint (Doc. No. 19), Defendants' Motion to Dismiss (Doc. No. 21), Plaintiff's Response in Opposition (Doc. No. 24), and Defendants' Reply in Further Support of the Motion (Doc. No. 26).

West, LLC and/or its affiliate and predecessor (the "Borrower" or "Cortez Road") requested a loan in the amount of $1,750,000 from Bancorp to finance the purchase of a commercial building located at 6205-6207 Cortez Road West, Bradenton, Florida 34210 (the "Property").  (Doc. No. 19 at ¶ 16.)  The loan application submitted to Bancorp listed the purchase price of the Property as $2,100,000.  (Id. at ¶ 18.)  Based upon this purchase price, Bancorp agreed to lend the Borrower $1,750,000, approximately 83% of the purchase price.  (Id. at ¶¶ 19-20.)  A first lien mortgage on the Property and an assignment of leases and rents were the collateral for the loan.  (Id. at ¶ 22.)

On or about March 2, 2006, PA/NJ Abstract, Inc., the authorized Issuing Agent for Defendant Lawyers Title Insurance Corporation ("Lawyers Title"), delivered to Bancorp a commitment for title insurance for the principal loan amount of $1,750,000.  (Id. at ¶ 36.)  This title insurance policy covered Bancorp in the event of a loss.  The Issuing Agent also gave Bancorp a copy of a separate commitment for title insurance that was issued to the Borrower insuring $2,100,000, the purported purchase price of the Property.  (Id.)

On March 10, 2006, Lawyers Title issued a Closing Protection Letter (the "CPL") to Bancorp in connection with the title insurance policy.  (Id. at ¶ 37.)  The CPL stated that Lawyers Title would reimburse Bancorp for losses incurred in connection with the closing of the real estate transaction under the following circumstances:

> 1.) Failure of said Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, or (b) the obtaining of any other document, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or the collection and payment of funds due you, or

2

> 2.) Fraud dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing. . . .

(Id., Ex. E.) On March 24, 2006, the Bancorp title insurance policy took effect. (Id. at ¶ 42.)

In or about August 2008, the Borrower defaulted on the loan. (Id. at ¶ 28.) At the time, the Borrower owed $1,762,192.59. (Id.) On December 2, 2009, the Superior Court of the State of Delaware entered judgment against the Borrower and in favor of Bancorp in the amount of $1,762,192.59. (Id., Ex. K.) After this default, one of the members of Cortez Road advised Bancorp that the sale price for the Property had been $1,750,000, rather than $2,100,000 as alleged. (Id. at ¶ 31.) This meant that Bancorp actually loaned the Borrower 100% of the purchase price, not 83%. (Id.) Upon investigation, Bancorp learned that Lawyer's Title's Issuing Agent prepared closing documents that falsely listed $2,100,000 as the purchase price of the Property. (Id. at ¶ 32.) However, a HUD-I Settlement Statement confirmed that the Borrower only paid $1,750,000. (Id. at ¶ 33.)

On June 10, 2009, Bancorp sent a claim (the "CPL Claim") to Lawyers Title based on the Issuing Agent's alleged fraud, a triggering event in the CPL that would require indemnification to Bancorp. (Id. at ¶ 44.) Pursuant to the CPL, Bancorp sought recovery on the grounds that it incurred a loss on the loan transaction as a result of the Issuing Agent's fraud and dishonesty. (Id. at ¶ 45.) Defendant Fidelity National Title Insurance Company ("Fidelity National") handled Bancorp's CPL Claim exclusively.[2] (Id. at ¶ 48.) On July 31, 2011, Fidelity National denied the CPL Claim. (Id. at ¶ 54.) Fidelity National refused to compensate Bancorp, asserting that a loss would not be realized until the Property was sold for an amount less than the balance owed on the loan. (Id.)

---

[2] According to Defendants, Lawyers Title became a subsidiary of Fidelity National on December 22, 2008. (Doc. No. 21-1 at 1 n.1.) On June 30, 2010, Lawyers Title merged into Fidelity National and ceased to exist as of that date. (Id.)

In August 2010, Bancorp eventually foreclosed on the mortgage. (Id. at ¶ 30.) On November 12, 2011, the Property was sold at a Sheriff's Sale, and Bancorp was the only bidder. (Id. at ¶ 55.) On March 22, 2012, the Manatee County Court in Florida, where the foreclosure action was filed, established the value of the Property at the time of the sale as $1,083,130.77 and entered a final deficiency judgment in the amount of $775,000. (Id. at ¶ 56.) On August 27, 2012, Bancorp sold the Property for $740,000 and net $677,217.25 after reductions and adjustments were paid. (Id. at ¶ 57.) On January 15, 2013, after the Property was sold for an amount less than the balance owed on the loan, Bancorp contacted Fidelity National and again demanded compensation on the CPL Claim. (Id. at ¶ 58.) Bancorp alleged that it was entitled to recoup $1,511,083.19[3] from Lawyers Title based on the Issuing Agent's alleged fraud in connection with the March 16, 2006 closing and loan transaction. (Id., Ex. K.) To date, Fidelity National has refused to compensate Bancorp for the losses it suffered due to the Issuing Agent's fraud and dishonesty. (Id. at ¶ 59.)

As noted previously, on September 19, 2013, Bancorp filed suit against Defendants in the Philadelphia Court of Common Pleas. (Doc. No. 1-5.) On October 18, 2013, Defendants removed the case to this Court based upon diversity of citizenship jurisdiction, 28 U.S.C. § 1332(a). (Doc. No. 1.) On November 21, 2013, Defendants filed a partial Motion to Dismiss. (Doc. No. 7.) A hearing on the Motion was held on March 19, 2014, and the Court granted Bancorp leave to file an Amended Complaint. (Doc. No. 17.) On April 18, 2014, Bancorp filed

---

[3] Bancorp arrived at this figure by starting with the judgment in the amount of $1,762,192.59 that was entered against the Borrower by the Superior Court of the State of Delaware, New Castle County on December 2, 2009. An additional $386,077.08 in interest accrued between the entry of judgment and when the Property was sold on August 27, 2012. The net proceeds of that sale paid to Bancorp were $677,217.25, which Bancorp subtracted from the total amount owed at the time. However, interest continued to accrue on the remaining $1,471,052.42 that was still owed. As of January 11, 2013, when Bancorp again demanded payment from Defendants on the CPL Claim, the total amount due, plus interest, was $1,511,083.19.

an Amended Complaint, asserting the following claims against Defendants: breach of contract (Count I); bad faith (Count II); and negligence (Count III). (Doc. No. 19.) On May 9, 2014, Defendants filed another Motion to Dismiss, seeking dismissal of Counts II and III. (Doc. No. 21.) Bancorp opposes the Motion. (Doc. No. 24.) For reasons that follow, the Court will grant the Motion to Dismiss.

### III.   STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

When determining whether a claim is plausible, a district court may also consider any affirmative defenses raised by the moving party. "Technically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer." Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (citing Fed. R. Civ. P. 12(b)). However, the so-called "Third Circuit Rule" allows affirmative defenses to be raised in a 12(b)(6) motion. Id. See also Ball v. Famiglio, 726 F.3d 448, 459 n.16 (3d Cir. 2013) cert. denied, 134 S. Ct. 1547 (U.S. 2014) ("[A] number of affirmative defenses that are not listed in Rule 12(b) [can] still be made by motion, provided that the basis of the defense [is] apparent on the face of the complaint."); Bethel v. Jendoco Const. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978) ("[A]n affirmative defense may be raised on a 12(b)(6) motion if the predicate establishing the defense is apparent from the face of the complaint."). For instance, a statute of limitations defense may be raised in a motion to

dismiss if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Robinson, 313 F.3d at 135 (quoting Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975)). See also Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 210 n.3 (3d Cir. 2001) ("qualified immunity may be raised in a motion to dismiss at the pleading stage . . . ."); Hartmann v. Time, Inc., 166 F.2d 127, 140 n.3 (3d Cir. 1947) (explaining that the defense of res judicata may be raised in the answer or in a motion to dismiss).

## IV. ANALYSIS

In their Motion to Dismiss, Defendants seek dismissal of Counts II and III of the Amended Complaint which encompass Plaintiff's bad faith and negligence claims. A discussion on each claim follows.

### A. Plaintiff's Bad Faith Claim Will be Dismissed

In Count II of the Amended Complaint, Bancorp alleges that Defendants are liable for Bad Faith Denial and/or Delay in Determination of the Insurance Claim. Defendants argue that because Bancorp's claim for indemnification for loss is based on the CPL, which contained the fraud provision, rather than the title insurance policy itself, the bad faith claim against them must be dismissed. Bancorp and Defendants agree that a claim for bad faith denial of insurance benefits requires that the claim arise under an insurance policy. (Doc. No. 21-2 at 5; Doc. No. 24 at 7.) Specifically, an insured may bring "an action arising under an insurance policy" if the insurer has acted in bad faith in denying a claim for benefits. 42 Pa. Cons. Stat. Ann. § 8371. However, Bancorp's claim for compensation "sought recovery pursuant to the CPL," on the grounds that Bancorp incurred a loss due to the Issuing Agent's alleged fraud. (Doc. No. 19 at ¶ 45.) Here, the question is whether the CPL constitutes an "insurance policy" under Pennsylvania law, such that Bancorp can allege a bad faith claim.

While the term "insurance policy" is not defined in Pennsylvania's bad faith statute, "title insurance" is described elsewhere as follows:

> "Title insurance" means insuring, guaranteeing or indemnifying against loss or damage suffered by owners of real property or by others interested therein by reason of liens, encumbrances upon, defects in or the unmarketability of the title to said real property; guaranteeing, warranting or otherwise insuring the correctness of searches relating to the title to real property; and doing any business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of this article.

40 Pa. Stat. Ann. § 910-1(1).  In contrast,

> A closing protection letter is an agreement by a title insurance company to indemnify a lender, or in some cases a purchaser, for loss caused by a settlement agent's fraud or dishonesty or by the agent's failure to follow the lender's written closing instructions.

James Bruce Davis, The Law of Closing Protection Letters, 36 Tort & Ins. L.J. 845, 845 (2001).  While it is true that both CPLs and title insurance policies are essentially indemnity contracts, "not all contracts of indemnity are insurance contracts . . . ."  1 Couch on Ins. § 1:7.  CPLs are frequently issued in connection with title insurance policies, and courts appear to be divided over whether they are entirely distinct instruments.  Because "[c]losing protection letters have seldom been the subject of litigation in the Third Circuit or Pennsylvania[,] . . . we look to other courts for guidance."  Stout St. Funding LLC v. Johnson, 873 F. Supp. 2d 632, 640 (E.D. Pa. 2012).

As noted, there is a welter of conflicting opinions.  One line of cases holds that CPLs, while related, are not the same as title insurance policies.  See Heritage Pac. Fin., LLC v. First Am. Title Ins. Co., No. 12-2594, 2013 WL 4401040, *5 n.16 (D. Md. Aug. 14, 2013) ("[A] CPL is not an independent title insurance policy . . . ."); JP Morgan Chase Bank, N.A. v. First Am. Title Ins. Co., 795 F. Supp. 2d 624, 628 (E.D. Mich. 2011) ("A closing protection letter is an indemnity agreement, not an insurance policy."), aff'd, 750 F.3d 573 (6th Cir. 2014); Freedom Mortg. Corp. v. Burnham Mortg., Inc., 720 F. Supp. 2d 978, 1003 (N.D. Ill. 2010) ("[T]he CPL is

8

a contract of indemnification and specific liability, not an insurance policy."); Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp., 655 S.E.2d 269, 274 (Ga. Ct. App. 2007) ("[U]nder Georgia law, the CPL is not a policy of insurance . . . ."); Metmor Fin., Inc. v. Commonwealth Land Title Ins. Co., 645 So. 2d 295, 297 (Ala. 1993) (per curiam) ("It is also clear that the closing service letter is not a title insurance policy.").

On the other hand, some courts have held that because CPLs are so closely related to title insurance policies, both instruments may sometimes be treated as one and the same.  See Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd., 858 F. Supp. 2d 402, 418 (D.N.J. 2012) ("CPLs are integral to title insurance policies."); Santiago v. E. Sav. Bank, FSB, No. 09-1269, 2011 WL 710216 (E.D. Pa. Feb. 28, 2011) ("A [CPL] is a document that is part of the process for obtaining title insurance."); Ticor Title Ins. Co. v. Nat'l Abstract Agency, Inc., No. 05-73709, 2008 WL 2157046, *6 (E.D. Mich. May 22, 2008) (explaining that CPL is "an integral part of the title insurance business"); Fleet Mortg. Corp. v. Lynts, 885 F. Supp. 1187, 1190 (E.D. Wis. 1995) (stating that CPLs "are related to the issuance of title insurance policy and are not a separate, unrelated service" and "concomitant with the issuance of title insurance policies").  See also Wells Fargo Bank, N.A. v. Bank of Am., N.A., No. 11- 4062, 2013 WL 372149, *6 (S.D.N.Y. Jan. 31, 2013) (stating that at the motion to dismiss stage in breach of contract action, "this Court is not able to determine that the parties did not intend the CPL and the Title Policy to be read as a single contract").

At least one jurisdiction has addressed the specific issue facing the Court here.  In Metmor Fin., Inc. v. Commonwealth Land Title Ins. Co., the Supreme Court of Alabama affirmed the entry of summary judgment in favor of an insurer, Commonwealth, when a lender, Metmor, sued the insurer for bad faith failure to pay an insurance claim.  645 So. 2d 295 (Ala.

1993). In that case, Metmor did not have an insurance contract with Commonwealth, but instead had a "closing service letter," similar to the CPL here. In determining that the CPL was not an insurance policy upon which Metmor's bad faith claim could be based, the Supreme Court of Alabama explained:

> Metmor argues that the closing service letter is an insurance contract between Metmor and Commonwealth. We disagree. This Court has previously stated that "although every contract implies an obligation of good faith and fair dealings, the only breach of contract which gives rise to a tort cause of action for 'bad faith' is [a] breach of a contract of insurance." Peninsular Life Ins. Co. v. Blackmon, 476 So. 2d 87, 89 (Ala. 1985). An insurer-insured relationship must exist. An insurance contract would be evidenced by one party's entering into a written contract of insurance with the other, by the one's paying premiums to the other, and by the other's placing the premiums into a central fund out of which claims would be paid. Peninsular Life, supra, at 89.
>
> The purpose of the closing service letter is to provide indemnity against loss due to a closing attorney's defalcation or failure to follow a lender's closing instructions. See, Lawyer's Title Ins. Corp. v. Edmar Construction Co., 294 A.2d 865 (D.C. App. 1972). It is clear from a reading of the closing service letter that it states Commonwealth's responsibility for the acts of its approved attorney. It is also clear that the closing service letter is not a title insurance policy. "Title insurance" is defined as "insurance of owners of property, or others having an interest therein or liens or encumbrances thereon against loss by encumbrance, or defective titles, or invalidity or adverse claim to title." § 27–5–10, Ala. Code 1975.
>
> We must conclude that Metmor presented no substantial evidence to support its bad faith claim. Therefore, we affirm the summary judgment.

Id. at 297. This reasoning is persuasive.

While there is certainly an insurer-insured relationship between Bancorp and Defendants, that relationship arises from the title insurance policy. Similar to the Alabama statute quoted in Metmor, Pennsylvania defines title insurance as protecting against losses which arise from liens, encumbrances, or defects which render title unmarketable. 40 Pa. Stat. Ann. § 910-1(1). In contrast, the CPL only protects against losses caused by: 1) the Issuing Agent's failure to comply with Bancorp's written closing instructions; and 2) the Issuing Agent's fraud or dishonesty in

handling Bancorp's funds or documents in connection with the closing. (Doc. No. 19, Ex. E.) As the court found in Metmor, it is clear that the CPL here is not a title insurance policy.

Although the title insurance policy and the CPL are both indemnity agreements, they protect against different types of loss. See JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co., 750 F.3d 573, 579 (6th Cir. 2014) ("The district court was thus correct that 'closing protection letters and title policies protect against entirely different risks.'"). See also Davis, supra at 858 ("The author disagrees that [CPLs] and title insurance policies are part and parcel of the same obligation. . . . [CPLs] and title insurance policies are different agreements that cover different kinds of risk.").

In this case, the CPL does not protect against losses which arise from liens, encumbrances, or defects which render title unmarketable. Therefore, it does not constitute "title insurance," as defined in 40 Pa. Stat. Ann. § 910-1(1). While the CPL may be an indemnity contract, it is not an insurance policy. Because a claim of bad faith denial of insurance benefits can only arise under an insurance policy, Bancorp cannot maintain this claim. For this reason, Bancorp's bad faith claim in Count II will be dismissed.

    **B.**    **Plaintiff's Negligence Claim Will be Dismissed**

In Count III of the Amended Complaint, Bancorp alleges that Defendants were negligent in appointing, training, retaining, and otherwise supervising the Issuing Agent, PA/NJ Abstract. Defendants argue that Bancorp's state law claim for negligence is barred by the following: 1) the "gist of the action" doctrine; 2) the "economic loss" doctrine; 3) Pennsylvania's two-year statute of limitations; and 4) an express limitation of liability provision in the CPL.

(Doc. No. 21-1 at 7.) Because Bancorp's negligence claim is barred by both the gist of the action and economic loss doctrines,[4] the Court need not consider Defendants' additional arguments.

### 1. The Gist of the Action Doctrine Bars Plaintiff's Negligence Claim

Defendants argue that Bancorp's negligence claim is barred by the gist of the action doctrine. (Id. at 11-13.) "Generally, the gist-of-the-action doctrine precludes a party from raising tort claims where the essence of the claim actually lies in a contract that governs the parties' relationship." Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 718 (Pa. Super. Ct. 2005). This doctrine operates to preclude a plaintiff from re-characterizing standard breach of contract claims as tort actions. Indalex, Inc. v. Nat'l Union Fire Insur. Co., 83 A.3d 418, 425 (Pa. Super. Ct. 2013) (quotation omitted); Pediatrix Screening, Inc. v. TeleChem Int'l, Inc., 602 F.3d 541, 548 (3d Cir. 2010) (quotation omitted). It therefore follows that "in determining whether a particular tort claim is barred by the gist of the action doctrine, the central analysis is whether the tort claim is based on contractual duties, or conversely, whether the contract is collateral to a tort claim that is based on duties imposed by 'larger social policies embodied in the law of torts.'" Mirizio v. Joseph, 4 A.3d 1073, 1084 (Pa. Super. Ct. 2010) (quotation omitted). While the Pennsylvania Supreme Court has not expressly adopted this doctrine,[5] the Superior Court of Pennsylvania has repeatedly held that the gist of the action doctrine forecloses tort claims:

1) arising solely from a contract between the parties;
2) where the duties allegedly breached were created and grounded in the contract itself;

---

[4] Pennsylvania courts use both doctrines "to determine whether tort claims that accompany contract claims should be allowed as freestanding causes of action or rejected as illegitimate attempts to procure additional damages for a breach of contract[.]" Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 103 (3d Cir. 2001).

[5] In an unpublished Opinion, the Third Circuit predicted that the Pennsylvania Supreme Court would adopt the doctrine as set forth in various Superior Court cases. Williams v. Hilton Grp. PLC, 93 Fed. App'x 384, 385 (3d Cir. 2004).

    3)      where the liability stems from a contract; or

    4)      where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (internal quotations omitted); Indalex, 83 A.3d at 425 (quotation omitted). Here, Bancorp's negligence claim is foreclosed because the duties allegedly breached were created and grounded in the CPL itself.

Courts in this circuit have held that a plaintiff's negligence claims are barred when the duties owed to the plaintiff arise from a contractual relationship between the parties, rather than from a larger, social policy.[6] For instance, in Jodek Charitable Trust, R.A. v. Vertical Net Inc., an assignee and successor-in-interest to the original shareholders of an acquired corporation brought an action against the acquiring corporation and related defendants, asserting various causes of action based on contract and tort. 412 F. Supp. 2d 469 (E.D. Pa. 2006). In dismissing each of the plaintiff's tort claims, including a claim for negligent supervision, the district court reasoned as follows:

> Here, the thrust of Plaintiff's tort claims, like its breach of contract claims, is that Defendants caused four delays during which Plaintiff was unable to sell the Merger Stock and it declined in value. These delays allegedly resulted from Defendants' failure to take various actions in a timely fashion—issuing share certificates, filing and/or updating registration statements, and releasing shares from Lock–Up and escrow. However, if it were not for the various contractual arrangements between the parties regarding the merger and the stock transfer, Defendants would have no obligation whatsoever to perform any of these actions, much less to perform them within a certain time. Plaintiff's tort claims thus all involve breaches of duties imposed only by mutual consensus and not "as a matter of social policy," thus simply replicating Plaintiff's breach of contract claims.
>
>                                                 ***
>
> Absent the various contracts to which the parties mutually assented, Defendants were under no obligation to perform, or not to perform, any of the actions that

---

[6] The high duty of care that a common carrier owes to its passengers is an example of a duty that stems from a larger social policy embodied in the law of torts.

> form the basis of Plaintiff's tort claims. Because Counts II, IV, V, VII, IX, and X of the Amended Complaint are thus an attempt to "recast ordinary breach of contract claims into tort claims," they must be dismissed under the gist of the action doctrine.

Id. at 479, 480 (internal quotations omitted). Similarly, a district court granted summary judgment in favor of an insurer after the primary beneficiary of a life insurance policy raised claims against the insurer for bad faith, breach of contract, breach of covenant of good faith and fair dealing, breach of fiduciary duty, negligence, and negligent infliction of emotional distress related to insurer's handling of claim. Oehlmann v. Metro. Life Ins. Co., 644 F. Supp. 2d 521 (M.D. Pa. 2007). Regarding the plaintiff's negligence and negligent infliction of emotional distress claims, the court explained that:

> Any legal duties owed to Plaintiff arise from the parties' relationship of Insurer and Beneficiary, and this relationship is governed by the insurance policy—a contract. Therefore, summary judgment must be entered in Defendant's favor as to these counts.

Id. at 534.

In Count III of the Amended Complaint, Bancorp contends that Defendants were negligent in appointing, training, retaining, and supervising the Issuing Agent. According to Bancorp, Defendants' tortious conduct placed the Issuing Agent in a position to engage in fraud and dishonesty. Bancorp's negligence claim is inextricably intertwined with its breach of contract claim based on the CPL, which delineates when Defendants will be responsible for the Issuing Agent's misconduct in connection with the March 16, 2006 closing. Like the cases cited above, any legal duties owed to Bancorp in connection with the Issuing Agent's conduct arise from the parties' relationship that is governed by a contract—the CPL. Thus, Bancorp's tort claim involves breaches of duties imposed by mutual consensus, rather than a general social policy. Bancorp's negligence claim simply replicates the breach of contract claim in Count I. In

this case, the gist of the action is grounded in contract, and for this reason, the negligence claim in Count III will be dismissed.

        **2.**       **The Economic Loss Doctrine Bars Plaintiff's Negligence Claim**

Defendants also argue that Bancorp's negligence claim is barred by the economic loss doctrine. (Id. at 11.) "The Economic Loss Doctrine provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 175 (3d Cir. 2008) (quoting Adams v. Copper Beach Townhome Communities, L.P., 816 A.2d 301, 305 (Pa. Super. Ct. 2003)). In this case, Bancorp is seeking to recover the costs associated with losses incurred due to the Issuing Agent's fraud and dishonesty in connection with the closing. In the Complaint, Bancorp only alleges economic harm and does not assert that it has suffered from any physical or property damage. Now, Bancorp "tries to get around the fatal limitation of the economic loss doctrine," id., by contending that its "losses extend beyond economic damage to non-economic losses, including heightened scrutiny of Bancorp by regulators and other such non-monetary harm." (Doc. No. 24 at 15.) These allegations of non-economic harm do not appear in the Complaint, and it would be futile to allow Bancorp to amend the Complaint a second time to include them. These newly alleged non-economic damages still do not stem from any physical injury or property damage. Under the economic loss doctrine, Bancorp cannot maintain a negligence claim that only asserts economic damages. For this additional reason, the Court also will dismiss Count III of the Complaint.

**V.    CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss will be granted. Counts II and III of the Complaint will be dismissed. An appropriate Order follows.